## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CÉSAR A. CALDERÓN SERRA AND TERESITA PALERM NEVARES A/K/A TESSIE CALDERÓN | CIVIL NO.: |
| Plaintiffs, | RE: BREACH OF FIDUCIARY DUTY R.I.C.O.; BREACH OF CONTRACT; SARBANES OXLEY VIOLATIONS |
| v. | |
| WILMINGTON TRUST COMPANY; BANCO POPULAR DE PUERTO RICO; UBS FINANCIAL SERVICES, INC; INSURANCE COMPANY A, B AND C | PLAINTIFF DEMANDS TRIAL BY JURY |
| Defendants. | |

### VERIFIED COMPLAINT

**TO THE HONORABLE COURT:**

**COME NOW**, César A. Calderón Serra and Teresita Palerm Nevares a/k/a Tessie Calderón (hereinafter referred to as "Mr. and Mrs. Calderón" or the "Plaintiffs"), represented through their undersigned attorney, and very respectfully request, state and prays:

### I.      JURISDICTION AND VENUE

1.      Original jurisdiction over all the causes of action is vested in this Court by virtue of 28 U.S.C. § 1331.

2.      This Court has original jurisdiction over all claims filed in the instant Complaint, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. §§ 777aaa – *et seq.* Specifically, a federal question is presented pursuant to § 322, 15 U.S.C. § 77vvv(b), which establishes this Court's jurisdiction as provided in 15 U.S.C. § 77v(a).

1

3.     This Honorable Court has jurisdiction also, pursuant to 18 U.S.C. § 1961 - 1968, known commonly as the Racketeer Influenced and Corrupt Organization Act ("R.I.C.O.") and in particular under 18 U.S.C. § 1964 in its civil context.

4.     In the alternative to the R.I.C.O. claim, this Court will also have jurisdiction as a federal question is posed pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

5.     Violations of Sarbanes Oxley Act of 2002, Title I, II, III, IV, V and IX, 15 U.S.C.A. §§ 302, 401, 404, 409.

6.     Supplemental jurisdiction can and should also be exercised under 28 U.S.C. § 1367.  This supplemental jurisdiction should be exercised under 31 P.R. Laws Ann. Tit § 3052, 31 P.R. Laws Ann. § 3081, for nullity of Contract or in the alternative for breach of contract, and in all events breach of fiduciary duty.  Also, Defendants' acts violated Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. §§ 5141 – 5142; and it is herein so claimed.

7.     Other reasons why exercising such supplemental jurisdiction would be proper have to do with the seeming emergence of a pattern of activity by all the defendants that indicates that multiple parties were duped into believing that the transactions engaged in by the defendants, including Wilmington Trust Corporation (hereinafter referred to as "WTC"), were legal when in fact they were not, and were thus void at the inception.

8.     Venue is proper inasmuch as the contracts and occurrences mentioned hereunder were entered into and occurred in the Commonwealth of Puerto Rico, even

though, they had to do with a nationally recognized bank doing business across state lines.

9. For all causes of action herein and hereunder contained, Mr. and Mrs. Calderón respectfully demand trial by jury.

## II. THE PARTIES

**PLAINTIFF:**

10. Plaintiffs, César A. Calderón Serra and Teresita Palerm Nevares a/k/a Tessie Calderón, are married to one another, of legal age, he is retired, and she is a housewife, both property owners, and residents and domiciled of the Commonwealth of Puerto Rico. Their domicile is in Condominio Caparra Classic, Apt. 202, Ortegón Ave., Guaynabo, Puerto Rico 00966.

**DEFENDANTS:**

11. Defendant-actor, Wilmington Trust Corporation (hereinafter, Wilmington Trust or WTC) is a trust company organized and existing under the laws of Delaware and subject to the trust laws of Delaware. It is also subject to the Trust Indenture Act of 1939 (TIA) and the Delaware Statutory Trust Act.

12. Defendant Banco Popular de Puerto Rico (hereinafter, "BPPR") is a financial institution organized and existing under the laws of Puerto Rico and subject to the laws of the Commonwealth of Puerto Rico. It was an active "actor" in the furtherance of the scheme for the benefit of the enterprise.

13. Defendant UBS Financial Services, Inc. (hereinafter, UBS) is a licensed brokerage firm and existing under the laws of the Commonwealth of Puerto Rico.

14.     "A" Insurance Company is an insurance company incorporated under the laws of the United States of America or elsewhere, which has issued a policy to cover some or all of the risks and/or liabilities, and/or occurrences incurred by Wilmington Trust Company or others mentioned in this complaint.

15.     "B" Insurance Company is an insurance company incorporated under the laws of the United States of America or elsewhere, which has issued a policy to cover some or all of the risks and/or liabilities, and/or occurrences incurred by Banco Popular de Puerto Rico or others mentioned in this complaint.

16.     "C" Insurance Company is an insurance company incorporated under the laws of the United States of America or elsewhere, which has issued a policy to cover some or all of the risks and/or liabilities, and/or occurrences incurred by UBS Financial Services, Inc. or others mentioned in this complaint.

### III.     BRIEF STATEMENT OF THE FACTS

17.     On or about October 2nd, 2003, the Puerto Rico Conservation Trust Fund (hereinafter referred to "PRCTF") which is a partial beneficiary of the transaction, and one of the infiltrated entities, filed an offering circular for the PRCTF secured notes due 2033. The cusip number for this transaction is 74526P AE4.  Almost simultaneously, R&G Financial Corporation and R&G Capital Trust III filed a registration statement or prospectus subject to completion before September 30th, 2003 (the "R&G Prospectus") (**Exhibit 1**).  It was amended by Amendment No. 4 to form S3 under the Securities Act of 1933.

18.     Stated in layman's language the transaction proposed in the offering circular of the PRCTF and the R&G Prospectus was as follows:

4

19.    The scheme here was that the PRTCF would issue notes for sale to the public in the amount of approximately $100,000,000.  Simultaneously, **R&G Capital Trust III**, a wholly owned subsidiary of R&G Financial Corp. ("R&G Holding") would be establish in Delaware, a company and or Trust called R & G Capital Trust III and would issue so called "preferred shares" with a value of approximately $100,000,000. (the "R&G Preferred"). Upon receiving payments for its notes, the PRCTF would, with the good funds generated, purchase the R&G Preferred. R&G Financial would then proceed to issue a so called debenture for the approximate amount of the face value of the R&G Preferred shares, thus receiving from R&G Capital Trust III the entire $100,000,000. The *de facto* result of this transaction was to provide further capital to R&G Financial was without collateralization of any true value, except that represented by the dilution of its share value, as R&G Financial *de facto* issuing the equivalent of common stock under the name of preferred, and the tax free status was a bogus one.  The PRCTF had no liability in the matter except to lend its name to the transaction.



20.    The purposes of the aforementioned transaction were multiple.

A)    First it was designed to deceive investors into thinking that they were purchasing an obligation of an agency of the government of Puerto Rico or other closely associated entity.  This was in fact not the case, since the *de facto* security or so called "bond" being purchased was the equivalent of an unsecured share of R&G common stock.  Actually, no substantive difference in fact existed between the so-called "preferred stocks" to "common" ones.



B)      The purpose was additionally to deceive the public into thinking that by using the word "preferred" the R&G Capital Trust III shares would enjoy a preferential rank when in fact no such preferential rank of any substantial value would be accorded to them. They were *de facto* common shares.

C)      The further purpose of the transaction was to create a vehicle of investment which would seem to be tax-exempt in Puerto Rico, thereby increasing its market ability and yield, and also making it highly attractive to investors.  Again, the public and Plaintiffs were deceived into thinking that was a "bona fide" bond.



D)      It was the avowed purpose of the combined PRCTF offering circular and the R&G Prospectus to deceive investors into believing that they were purchasing a security backed by a government agency, that they were purchasing a security that by its nature should be, and was, a tax-exempt security, and that the solidity of both R&G and Puerto Rico government would be somehow backing the security. The truth of the matter was that the only backing for the security purchased by the investors, (the CT Notes), was a share of R&G Capital Fund III with no other recourse. The entire transaction was an illegal step transaction designed to achieve tax-free status where none was legitimately merited.

21.     The transaction described above was created for the purposes of providing the public and government with the semblance of a tax-exempt transaction, when in fact

what was occurring in this transaction, was that R&G Financial was diluting its share value, and paying for funds received with an unsecured note.

22.   The transaction of record was cleverly presented in two separate prospectuses or offering circulars, dated respectively September 30th, 2003, and October 2nd, 2003, which also referred the investor to other documents not therein included, so that an investor would find it virtually impossible to understand the entirety of the issues, without seeing all of the documents together, and their losses it is improbable that a reasonable "layman" would have understood them.  In any event, Mr. and Mrs. Calderón were not sent copies of both.

23.   A reasonable man would have believed that the PRCTF was somehow insuring the transaction as a guarantor.  Furthermore, financial statements of the PRCTF were included in the PRCTF offering circular.  They in fact had no reason for being there except to dupe the investors.  Similarly the R&G Capital Trust III shares were never fully valued at the inception so that investors might understand their true value at moment of issue. Rather, a future value was used in order to both avoid comparison, and also to avoid dilution issues with shareholders.



24.   The aforementioned scheme was created and/or furthered by the actors, the PRCTF, UBS, R&G Financial and BPPR.  All benefited in one way or the other, from the scheme.  All gained commissions, all gained fees.  R&G Financial obtained additional unencumbered capitalization.  BPPR and Wilmington gained fees and/or commissions; UBS gained commissions and/or fees.   The marketing of the instruments sold, represented huge earnings to UBS, R&G Financial and, to some degree, to the PRCTF.

Total deductions from the offerings of fees and commissions amounted to over $3.6MM. (**Exhibit 2**, Forms S-3 and **Exhibit 1**, offering circular, page 153 of this exhibit).

25.    UBS acted as partial underwriter and conceived the scheme.

26.    Further facts and/or events, such as the further explanation of the scheme, the investments, its marketing, etc., are incorporated by reference, as they are attached and explained in all the Exhibits affixed to the instant Complaint. Said exhibits are further incorporated as part of Mr. and Mrs. Calderón's allegations, as they speak for themselves. **Exhibits 1 and 2**.

27.    The infiltrated entity was the Puerto Rico Department of Treasury ("Departamento de Hacienda"), which was deceived into providing rulings, etc., when it should not have done so. I.e., generally a security issued by an instrumentality of the Commonwealth of Puerto Rico is deemed tax-free, but it is the understanding of Mr. and Mrs. Calderón that in order to receive such status, the Commonwealth of Puerto Rico or its instrumentality, must be liable in some way for the debt. (*See* Puerto Rico Treasury Department Regulations). This is in fact the case.

28.    PRCTF was not liable for losses. The R&G preferred share was the sole guarantee.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION - FAILURE TO COMPLY WITH
### THEIR FIDUCIARY DUTY
(All prior paragraphs are hereby incorporated by reference.)

29.    All of the statements here and above contained and hereunder contained are hereby incorporated by reference in this cause of action.

30.     WTC acted as the trustee for the R&G debenture. As such, it had a duty to care towards the investors regarding any slippage in value or event of default possible literal or to be inferred from its relationship with R&G Financial Corp. and R&G Capital Trust III.  15 U.S.C. §§ 777aaa – *et seq*.

31.     WTC has failed in its duty to the investors inasmuch as the R&G stock began to lose value years ago, and it has done nothing "along the way" to inform investors.

32.     During the years 2007 and 2008 and 2009, R&G Financial did not issue annual statements.  Continuous extensions were requested to the Securities and Exchange Commission (the "SEC").

33.     In the absence of annual statements, it was impossible to file required responsible annual **certificates of compliance** with the indenture trustee. Thereby creating an immediate event of default which WTC failed to exercise.  If R&G was certain it was complying, all it had to do was to certify its compliance even if it did not have their exact figures.

34.     WTC has a duty to care for the interest of investors even today.  BPPR also has this duty.   Though, R&G Financial has sought protection under the US Bankruptcy Laws and though, such a filling represents an event of default, to Plaintiffs' knowledge, no default had been called.  No adversary action has been filed under the Federal Bankruptcy Code, where Bankruptcy Case No. 10-04124 is being heard.

35.     Fraud might remove R& G Financial from bankruptcy status, yet, nothing has been proposed or done.  The banks and brokers have avoided suing one another as



part of a conspiracy of scheme of constructive approval.  No default has been called by Wilmington.

36.     WTC and BPPR failed in their duty to investors as trustees, as they did not adequately fiscalize or examine the actions of third parties which have been substantially responsible for many of the financial difficulties of R&G Financial Corp., such as the extremely high rents paid on real state by R&G Financial Corp. and the subsidiary R&G Premier Bank.

37.     WTC and BPPR are responsible for Mr. and Ms. Calderón's losses, pursuant to their inappropriate discharge of their fiduciary duties as trustees, 15 U.S.C. §§ 777aaa – *et seq*.

38.     Under the Trust, WTC, as trustee, was responsible for assuring compliance of R&G Financial under the covenants of the Trust.  A "Notice of Default" should have been issued to R&G Financial by WTC, and long-ago requested by BPPR.

39.     The herein described actions and inactions of WTC and BPPR, breached and violated their trust, fiduciary duty, and duty to care, by failing to prevent further losses to Mr. and Mrs. Calderón, which it could have easily done by extending a "Notice of Default" to R&G Financial, and/or selling at a loss when some value was still recoverable.   Through the "Notice of Default," WTC and BPPR could have, under the covenants of the R&G Trust, sought a remedy that would have prevented further loss of both principal and income to the investors in the CT Notes.

40.     BPPR could have timely requested from WTC to issue the "Notice of default."  It was its obligation to do so as trustee of the CT Notes.  It recognized its power

and obligation in the letter sent on March 1st, 2010. (**Exhibit 3**). But still, BPPR stood silent for years, while the bondholders kept loosing their investments.

41.     A later letter, from May 3rd, 2010, was sent from BPPR informing that it had finally, long after R&G Financial's never-ending financial crisis, requested from WTC to enter a "Notice of default" on R&G Financial. (**Exhibit 4**).

42.     The WTC and BPPR's actions, and inactions, were contrary to those directly specified in the RG Trust. Its execution of the covenants of the RG Trust was flawed and in detriment to the interests of the investors.

43.     Mr. and Mrs. Calderón have suffered, and continue to suffer, irreparable losses due to the failure to care, failure to report, and failure to provide timely notice of occurrences to the bondholders, specifically Mr. and Mrs. Calderón, which might have allowed them to assess these positions and to seek a sale at a no loss, or partial rather than total loss. Though, a partial loss would have been less than acceptable, if there had been true diligence, investors would have been better served.

## SECOND CAUSE OF ACTION - R.I.C.O
(All prior paragraphs are hereby incorporated by reference.)

44.     This is an action under the R.I.C.O statutes, to wit, 18 U.S.C. §§ 1961-1968. All defendants, as explained further, engaged in activities amounting to violate § 1962 of the R.I.C.O. statute. *Id.* at § 1962. For the purposes of this cause of action, the following should be considered defined terms.

> A)     The scheme: that cumulus of actions which created the CT Notes, the R&G Capital Trust III, the R&G Capital Trust III Preferred shares, the R&G Financial Corp. debenture, and the various other contractual relationships associated with the issue of the aforementioned offering

statement of October 2nd, 2003; the R&G Financial Corporation, and R&G Capital Trust III filing of form S3 on September 30th, 2003. The ultimate purpose of the scheme was to create the semblance of a tax-free security in a security which in fact was *de facto* a share of R&G Trust III with no special rank or privilege. For this purpose, the Puerto Rico Department of Treasury ("Departamento de Hacienda"), was infiltrated and caused to issue improper tax exemption to the CT Notes. It was at all times a highly risky investment, which by offering it is a "tax-free" one; investors wrongly considered it an attractive one. In short, the purpose was to defraud for profit.



B)    Infiltrated entity was the Puerto Rico Treasury Department ("Departamento de Hacienda"), which was maliciously infiltrated for the purpose of obtaining its imprimatur on the present transaction.

C)    The PRCTF, an infiltrated actor, would gain very little for the trust, with the exception of a modest spread.

D)    Actors are WTC, who as trustee for the R&G Financial debenture and the R&G Capital Trust III, R&G Financial, UBS Financial BPPR and the PRCTF who could have each raised a red flag regarding the impropriety or illegality of the step transaction. They did not.

E)    UBS Financial Services Incorporated of Puerto Rico, was an actor who acted in the conception of the scheme and enactment of same for the benefit of the enterprise. One of the masterminds in creating the scheme.

F)     BPPR, acted in the conception of the scheme and enactment of same for the benefit of the enterprise.

G)     The enterprise was designed to produce high fee income to the actors, to wit, the sum of approximately over $3.6MM (*see* page 16 of the addenda to the offering circular, herein attached as **Exhibit 2**) or more including trustee fees.

H)     Overt actions were, to name only some as follows: (1) the R&G Financial prospectus dated September 30th, 2003; (2) the issuance of the PRCTF offering circular on or about October 2nd, 2003; (3) each and every individual transaction mentioned or included as an appendix or exhibit in the aforementioned documents; (4) the inclusion of the statement in the offering circular, in an effort to make the investors think that these assets were material to the transaction; and (5) a "Capitalization" statement in the R&G's S-3 form of June 30, 2003, designed to book future profit or value. A $3.2 billion deposit base was cited, which by information and belief, was partially brokered deposits.

45.     The defendants used interstate commerce to further the enterprise's activities.

46.     The R.I.C.O scheme of reference consisted of dressing up a transaction which would not normally merit tax-exempt status, and marketing it as an exempt security for the profit of the actors in the furtherance of the enterprise. Investors sought a "tax-free" transaction, but it was not. This misleading act led investors, including Mr. and Mrs. Calderón, to believe that the investment was worthy and one approved and

supported by the "Departamento de Hacienda." Risk though was not allegedly present, was minor.

47.    The enterprise is an ongoing one and has engaged in further issues of stock under similar circumstances such as the R&G Capital Trust I, II, IV, V, and VI.

48.    The defendants incurred in step transactions.[1] This further sustains the R.I.C.O. cause of action.

49.    In the transaction of reference, which created the CT Notes, the R&G Capital Trust III shares, and the R&G Financial Corp. debenture, the individual transaction must be viewed as a part of a whole (the scheme) designed to camouflage the reality of the ultimate item being purchased (the Capital Trust III share under the cloak of the PRCTF imprimatur).

50.    From the beginning there was a binding commitment to integrate the various transactions described in both prospectuses of and September 30th, 2003, and October 2nd, 2003 (**Exhibits 1 & 2**), and to consummate the scheme of issuing the CT Notes, issuing the R&G Capital Trust III preferred, and issuing the R&G Financial Corp. debenture, all for the purpose of defrauding investors and taxing authorities.

51.    The transaction described would have become meaningless as the legal relationships created by any one of the parts would be fruitless or meaningless without completion of the whole. Thus, if for some reason the transaction had been structured so that no money would flow to R&G Financial, it would not have fulfilled the purpose of funding R&G Financial holding company, with inexpensive unsecured or *de facto* unsecured funds.

---

[1] A Step Transaction is defined in tax law as a series of separate but related transactions which may be viewed as a single transaction and the tax liability may be base of that transaction rather than the individual transaction in the series.

52.     The transaction of reference (the scheme) was the intended result, i.e., to provide R&G Financial with additional funding. Each separate transaction involved was undertaken in order to achieve this end result.

### THIRD CAUSE OF ACTION – RULE 10b-5
(All prior paragraphs are hereby incorporated by reference.)

53.     As it has been previously stated and explained with detailed facts, WTC, UBS, BPPR and R&G Financial, employed a scheme – also detailed above – to sell and convince Mr. and Mrs. Calderón that the type of investment they were making when they "obtained bonds of the PRCTF," was a government backed high quality investment. This was not actually the case. They obtained the equivalent of "common" shares of R&G Financial. 15 U.S.C.S. § 78j; 17 C.F.R. § 240.10b-5.



54.     The aforementioned misrepresentations are in respect to a material fact. They were made in regard to the type of investment Mr. and Mrs. Calderón were making. Mr. and Mrs. Calderón believed, when offered the herein discussed investment that they were obtaining an instrument guaranteed with the PRCTF. They were not. Had they known that their investment depended on R&G Financial's already precarious economic status, they would have never made such an investment.

55.     All of the defendants' intent at the time of the creation of the scheme, was to fraudulently and with scienter, promote their investment and obtain income as a result. All of them knew all along, that the investments depended upon R&G Financial's economic status, the value of the so-called "preferred shares," but the document sold to Mr. and Mrs. Calderón the idea that the bonds were guaranteed by the PRCTF.

56.     Furthermore, all of the defendants represented that the fact that the Puerto Rico Department of Treasury, ("Departamento de Hacienda"), considered the "bonds" to

15

be "tax-free," was a tacit approval of this type of investment. It was misrepresented to them, directly and/or indirectly, that said investment had some kind of governmental backing.

57.     Mr. and Mrs. Calderón relied all the time, on the defendants' good-faith, and relied that they were going to fully and properly discharge their fiduciary duty. They did not, and this caused Mr. and Mrs. Calderón's loss of their investment.

### FOURTHCAUSE OF ACTION - PUERTO RICO CONTRACT LAW
(All prior paragraphs are hereby incorporated by reference.)

58.     The transactions of reference which are the result of the scheme and which cause the purchase of securities which are not what they seem to be by the investors is in violation of Puerto Rico Contract and Tort Law. Investors were deceived.

59.     There is fraud in the inducement inasmuch as investors were led to believe that the PRCTF would stand behind the securities being issued to the extent of its statements. In fact, PRCTF was not behind the securities, and never intended to be. It only used its "name" as a "bait" to obtain the consent of the investors. Relying on this misleading tactic, many investments by many clients were made, including Mr. and Mrs. Calderón's investment.

60.     As such, the consideration or cause for the initial contract was fatally flawed by deceit, and was furthermore, the product of insidious machinations in order to gain consent of the investors. Under P.R. Laws Ann. Tit 31, false consideration causes nullity, § 3433. Consent obtained by insidious machinations or "DOLO" is under §§ 3403 and 3408, and renders the transaction void at the inception.

61.     DOLO is a word which does not admit full translation into English, but can be applied regarding all obligations 31 P.R. Laws Ann. § 3019.

62.     Any renunciation of DOLO is null and void under Puerto Rico Law.

63.     The right of resolving obligations, as if they never had occurred, is implicit where DOLO has been present.

64.     Article 1077 of the Puerto Rico Civil Code ("Article 1077"), P.R. Laws Ann. Tit 31 § 3052, grants the faculty of resolving obligations to any member of a reciprocal one who had been the object of breach of contract and/or fraud.

65.     In the present case, Mr. and Mrs. Calderón declare that a reasonable person, or a reasonable investor, who did not have specific accounting, legal or securities training, and that even a sophisticated one, would have believed that the PRCTF was backing the securities offered, and that the use of the word "preferred" regarding the R&G Capital Trust III shares granted them some special status.   The misleading statements affected the principal obligation of the investment contract.   Also, the "Capitalization" statement of the R&G's S-3 of June 30, 2003, was misleading as it used future values.



66.     This having not been the case, Mr. and Mrs. Calderón were duped into the investment, and the fraud perpetrated in the inducement with DOLO of the highest magnitude and gravity ("dolo grave"), grants them the ability to declare the transaction null as they are doing here, requiring the return of the sums tendered plus damages. *Id*.

67.     The sum originally tendered by Plaintiffs in the instant case were $2,050,000.00. **The present market value of their investment is zero**.

68.     Up until days after March 1st, 2010, (**Exhibit 2**), when Mr. and Mrs. Calderón received a circular from BPPR so dated, they had never received a written communication from any trustee or party, except for monthly statements indicating what

was going on with their investment, nor the slighting value of saying. Mr. and Mrs. Calderón aver that the lack of communication and inactions such as the non calling of a default by WTC are and were designed to confuse and conceal. Mr. and Mrs. Calderón further aver that the evidence will show that all the defendants were really acting "in concert."

69.    Likewise, by information and belief, since the securities did not lose their value in one day, but rather over an extended period of time, Mr. and Mrs. Calderón were uninformed of any sales or offers to buy these securities, which may have made them partially whole.

**SARBANES OXLEY VIOLATIONS**
(All prior paragraphs are hereby incorporated by reference.)

70.    That the actions herein alleged were not or may not have been consulted with Independent Auditors and Independent Audit committees, prior to being taken, as may be required by the Sarbanes Oxley Act of 2002, 15 U.S.C.A. 7201 ("Sarbanes-Oxley").

71.    No deficiencies were listed, about the internal controls and information.

72.    No significant changes in internal controls or related factors that could have a negative impact on the internal controls were listed or reported.

73.    The published financial statements were not accurate and were not presented in a manner that does not contain incorrect statements or admit to state material information.

74.    Their annual reports did not comply with reporting the scope and adequacy of the internal control structure and procedures for financial reporting.



75.     Issuers of the Trust did not disclose to the public, on an urgent basis, the information about the material changes occurring in their financial condition or operations.

76.     That any action taken on a personal enmity basis is not apposite to the interests of PRCTF and its stockholders, and contrary to the provisions of applicable SEC Regulation and Law and the Sarbanes-Oxley Act.

77.     That Defendants and others yet unknown or yet to be alleged as responsible, respond *in solido* and as fiduciaries with a duty to care and a duty of loyalty, as well as their duties under civil law "mandates", for actions they should have taken, avoided, or known about, or insisted they be informed about, or reasonably be advised thereof and regarding which they should have insisted advising the S.E.C. and BPPR and WT at large as defined in Sarbanes-Oxley.

**WHEREFORE**, Mr. and Mrs. Calderón request of this Honorable Court that it enter judgment as follows:



A)     WTC and BPPR breach of their fiduciary duty, owed to Mr. and Mrs. Calderón, which resulted in loss to them of over $2,340,578.50 as to August 31st, 2010, and accruing the rate of $10,762.50 per month;

B)     That all the defendants be found liable under the R.I.C.O. statute, and imposed treble damages for a total amount of $7,021,735.50;

C)     The Calderóns' loss of money investment due to all defendants' deceit in the inducement or "dolo" is $2,050,000.00 plus losses of interest to their account estimated at no less than $290,587.50 plus unearned interest;

D)    In the event that "dolo" or "fraud" in the inducement is not found, defendants breach of contract and fraud with the Calderóns, is estimated in an amount of not less than $2,340,578.50;

E)    Damages suffered due to all defendants' fraud inducement or breach of contract which are estimated in an additional amount of no less than $2,340,578.50;

F)    Legal fees and costs; and,

G)    Any other relief as the Honorable Court may deem proper and just.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 20th day of September 2010.

s/ Ralph Vallone, Jr.
RALPH VALLONE, JR.
ATTORNEY FOR PLAINTIFF
USDC NO. 117806
1319 ASHFORD AVE.
SON SID COND., SUITE 1
SAN JUAN, PUERTO RICO 00907
TEL.: (787) 723-9393
FAX: (787) 723-9251
rv@rvallonelawoffice.com

## STATEMENT UNDER PENALTY OF PERJURY

We, César A. Calderón Serra and Teresita Palerm Nevares a/k/a Tessie Calderón, under penalty of perjury, hereby attest that we have read the foregoing Verified Complaint and that the facts alleged there are true, to the best of our knowledge.

**CÉSAR A. CALDERÓN SERRA**

**TERESITA PALERM NEVARES**
**A/K/A TESSIE CALDERÓN**

20